STATE of Iowa ex rel. Iowa STATE HIGH-
WAY COMMISSION, Appellant,

v.

CITY OF DAVENPORT, Iowa, Appellee.

No. 56434.

Supreme Court of Iowa.

June 26, 1974.

Richard C. Turner, Atty. Gen., Asher E. Schroeder, Special Asst. Atty. Gen., and Gary M. Peterson, Asst. Atty. Gen., for appellant.

Donald H. Sitz, of Lane & Waterman, and Margaret Stevenson, Asst. City Atty., Davenport, for appellee.

Heard before MOORE, C. J., and MASON, REES, REYNOLDSON and McCORMICK, JJ.

McCORMICK, Justice.

This appeal involves a dispute between the states of Iowa and Illinois on one side and the City of Davenport on the other over the right to unexpended toll revenue in the accounts of the Davenport Bridge Commission at the time the City conveyed the Iowa-Illinois Memorial Bridge to the states. The conveyance occurred, pursuant to agreement, on December 31, 1969. The bridge commission, upon its later dissolution, turned over $626,487.34 in surplus toll revenue to the City. The State of Iowa brought this declaratory judgment action seeking to establish the right of the states of Iowa and Illinois to that fund. Trial court held for the City. We affirm.

The case was tried to the court at law. We are bound by trial court findings of fact supported by substantial evidence, and we view the evidence in its most favorable light to sustain those findings.

Long v. Glidden Mutual Insurance Association, 215 N.W.2d 271, 272 (Iowa 1974).

Most of the material facts were stipulated. Others are not disputed.

The original span of the Iowa-Illinois Memorial Bridge, crossing the Mississippi River from Bettendorf, Iowa, to Moline, Illinois, was constructed by the City of Davenport under authority of federal enabling legislation enacted in 1928. Its cost was about $1,400,000. Construction was completed in 1935. An additional span was subsequently added under the authority of federal enabling legislation enacted in 1952. Its cost was about $7,500,000. That span was completed in 1960.

Construction was financed on each occasion by sale of City revenue bonds to be paid from toll revenue. Expense of bridge operation and maintenance was also to be paid from tolls. Payment of the revenue bonds was secured by a trust indenture executed by the commission. The specific terms of the trust indenture were not shown in the record, but there was evidence all bridge revenue was first placed in a revenue account and later allocated in accordance with the trust indenture to various funds, including a sinking fund, severance pay fund, reserve fund, revolving fund and operation and maintenance fund. The sinking fund was used to retire the bonds. The reserve fund alone contained $250,000.

In 1965 the federal highway administrator and highway officials of Iowa and Illinois determined the bridge should be conveyed to the states for inclusion in the interstate road system as part of Interstate Route 74. The City did not object to inclusion of the bridge in the interstate system but wanted to maintain ownership and seek federal authority to collect tolls in order to finance construction of an additional bridge. The federal highway administrator would not agree. After considerable resistance the City finally capitulated and entered an agreement with Iowa, Illinois, and the federal government to give the

bridge to the two states for inclusion in the interstate system.

The agreement was dated August 23, 1965. The covenants of the parties were as follows:

1. The City of Davenport and the Davenport Bridge Commission offer to convey the Iowa-Illinois Memorial Bridge to the Department of Public Works and Buildings of the State of Illinois and to the State of Iowa when said bridge is free from all mortgages, liens or encumbrances of any nature, and when said bridge and its approaches are structurally sound and in a good state of repair.

2. The Department of Public Works and Buildings of the State of Illinois agrees to accept title to the Illinois portion of the Iowa-Illinois Memorial Bridge and its approaches and the State of Iowa agrees to accept title to the Iowa portion of the Iowa-Illinois Memorial Bridge and its approaches when all of the costs of construction or acquisition of the bridge and its approaches have been repaid, including all bonds and interest charges in connection therewith, and the bridge is free from all mortgages, liens and encumbrances of any nature, and when said bridge and its approaches are determined by said Department and said State of Iowa to be structurally sound and in a good state of repair.

3. Henceforth, all tolls received from the operation of the bridge, less the actual cost of operation and maintenance, shall be applied to the repayment of all of the costs of construction or acquisition of the bridge except that part contributed by the United States; and

4. No tolls shall be charged for the use of such bridge after such costs of construction and acquisition shall have been repaid; and

5. After the date of final payment the bridge shall be maintained and operated as a toll-free facility.

6. Said conveyance shall be by warranty deed and shall be in accordance with all appropriate and applicable Federal and State laws.

7. At such time as the title to the bridge is transferred to the Department of Public Works and Buildings of the State of Illinois and to the State of Iowa, an agreement covering maintenance and operation of the bridge will be entered into by the States.

As contemplated by the agreement the City through its bridge commission continued to operate and maintain the bridge and to collect tolls. The bridge would not be conveyed until its debt was paid and it was found by the states to be in a good state of repair. There was substantial evidence, found to be true by trial court, that the bridge commission regularly filed copies of its annual financial statement with the highway commissions in Iowa and Illinois as well as with the Davenport city clerk.

When it appeared the time was approaching when the bridge debt would be paid, the parties met February 19, 1969, to discuss arrangements for conveyance of the bridge pursuant to the 1965 agreement. Bridge commission minutes show both states were represented by highway commission officials. The bridge commission, which operated on a fiscal year ending October 31, reported the remaining bridge debt was $636,390. Estimated net revenue allocable to the sinking fund by October 31, 1969, would total $558,800. An additional $75,760 would be allocable by the end of 1969. The parties therefore fixed December 31, 1969, as the target date for conveyance of the bridge.

They also agreed to advance the annual inspection of the bridge so it would be completed by July 31, 1969. That way any required repairs could be completed by the

conveyance date. Except as might be revealed by such inspection the paving was agreed to be in first-class condition. Acceptance of the status of the bridge by the states was to be accomplished by October 1. The states were to be responsible for any structural modification and were to agree between themselves regarding maintenance and operation after conveyance. The bridge commission's attorney was directed to prepare the legal instruments necessary to effect transfer of the bridge at the appropriate time.

The minutes reveal the parties also agreed, "Only the physical structure of the bridge and real estate connected therewith, together with all the plans and specifications and the maps, are to be transferred to the States of Iowa and Illinois."

Pursuant to the arrangements worked out in the February 19 meeting, the City conveyed the bridge to the states on December 31, 1969, noting in a cover letter its understanding the conveyance constituted full and final compliance by the City with the August 23, 1965, agreement.

The bridge commission wound up its affairs and dissolved December 15, 1971, turning over its assets including surplus toll revenue to the City. The record does not show how much of the surplus revenue came from each of the commission accounts. It appears, however, the resulting fund included sums from the sinking fund, severance pay fund, reserve fund, and operation and maintenance fund. This declaratory judgment action was commenced December 20, 1971. On March 7, 1973, by city council resolution, the City placed the money in trust, limiting its use to acquisition and construction of a new interstate bridge. As of the March 23, 1973, trial, the fund with interest had grown to more than $700,000.

Trial court found the city and its commission had complied with requirements of federal and state law in collecting tolls. The court held neither the statutes nor the 1965 agreement required transfer of surplus toll revenue to the states. The court directed the City to hold the money in trust in accordance with the city council resolution for acquisition and construction of a new interstate bridge.

The State of Iowa raises three questions in its appeal. Was the surplus toll revenue collected in contravention of federal statute? Was its collection improper under Iowa law? Should it be turned over to Iowa and Illinois for expenditure on the bridge from which it was collected?

I. *The federal statute.* The first span of the bridge was constructed under authority of Act of May 26, 1928, ch. 769, 45 Stat. 759. The second span was constructed under authority of an amendment to that statute, Act of July 16, 1952, ch. 891, 66 Stat. 734.

The 1928 statute authorized six individuals to build the bridge in conformity with provisions of the Bridge Act of 1906, 33 U.S.C. §§ 491–499. Those individuals assigned their rights to the City of Davenport which built the bridge and established a bridge commission to operate it. See chapter 383, The Code.

The enabling statute also provided that if the bridge was acquired through condemnation or expropriation by Iowa or Illinois, or the states jointly, after 20 years from its completion date, the owner would be allowed damages in accordance with a statutory formula. As it turned out, the bridge was not acquired by the states through either condemnation or expropriation, but through agreement. Therefore this provision of the statute is inapplicable.

In its original form the 1928 statute also authorized the City to charge tolls to obtain revenue to operate, repair and maintain the bridge and to provide a sinking fund to amortize its cost over a period not to exceed 20 years. When the sinking fund became sufficient to pay the cost, the bridge was thereafter to be operated toll free or the rates of toll "so adjusted as to provide a fund of not to exceed the

amount necessary for the proper maintenance, repair, and operation of the bridge and its approaches under economical management."

The 1952 amendment changed this authorization to provide that when the sinking fund to amortize the cost of. original construction became sufficient, the bridge was thereafter to be operated toll free "in accordance with such arrangement as may be mutually agreed upon by the public agency or political subdivision then owning said bridge and the State Highway Departments or other appropriate authorities of Iowa and Illinois."

The amendment contained a separate provision authorizing construction of the second span. Tolls could be charged to obtain revenue to operate, repair and maintain the bridge as enlarged and to provide a sinking fund to amortize the cost of such enlargement over a period not to exceed 30 years. After the sinking fund became sufficient to do so the bridge was to be operated toll free in accordance with an arrangement to be mutually agreed upon by local and state authorities.

Thus, as amended, the enabling statute provided the bridge as enlarged was to become toll free when the sinking fund became sufficient to amortize its total cost. The arrangement for such toll-free operation was to be mutually agreed upon by the bridge commission or City and the states.

The State of Iowa contends the commission violated the statute by collecting tolls after the bridge should have been toll free. We do not agree.

■ Familiar rules of statutory construction are applicable. The goal is to ascertain legislative intent in order, if possible, to give it effect. Words are to be given their ordinary meaning unless defined differently by the legislative body or possessed of a peculiar and appropriate meaning in law. Effect is to be given to the entire statute. Its terms are not to be changed under the guise of construction.

In searching for legislative intent, we consider the objects sought to be accomplished as well as the language used and place a reasonable construction on the statute which will best effect its purpose. State v. Prybil, 211 N.W.2d 308, 311 (Iowa 1973).

■ The statute has not previously been construed. However, we believe its meaning is clear. Under its terms the charging of tolls is not made to end at the precise moment funds on hand equal the amount of outstanding indebtedness. Tolls are authorized for a number of purposes, only one of which is to amortize the cost of construction. The statute .obviously contemplates allocation of toll revenue to various individual accounts, only one of which is the sinking fund. The statute provides the bridge is to be made toll free when the sinking fund becomes sufficient to amortize the cost of construction. In so doing it defines a time by reference to the status of a specific bookkeeping account, not by reference to total funds on hand in all accounts or to the net worth of the commission. The record shows the parties agreed that point was reached December 31, 1969. Pursuant to mutual agreement of the parties, as contemplated by the statute, no tolls were collected after that time.

The State does not contend and has not shown the accounting practices of the bridge commission were irregular or improper. It seems to rely on an assumption that because surplus revenue was on hand when the sinking fund became sufficient to amortize the cost of the bridge in December 1969, the bridge was actually "paid for" much earlier. This assumption is wrong. The bridge was not "paid for" and hence not required to be toll free under the statute until the sinking fund became sufficient to amortize its cost. That did not happen until December 31, 1969. Tolls until then were collected under authority of the 1928 statute as amended, not in contravention of it.

Simply put, tolls were not collected after the bridge should have been toll free be-

cause they were not collected after the sinking fund became sufficient to amortize the cost of the enlarged bridge.

Trial court was right in holding the surplus toll revenue was not collected in contravention of the federal statute.

II. *The Iowa statute.* The State alleges the collection of tolls was also unauthorized under the applicable Iowa statute, § 383.13, The Code. Under that section, where not prohibited by federal law, the charging of tolls may be continued or resumed after a bridge would otherwise be toll free in order to finance acquisition, construction, reconstruction, extension, enlargement, replacement, or renewal of any other bridge owned in whole or in part by a city.

The State's contention is moot in view of our holding the tolls were collected under authority of the federal statute. Although the City has elected to apply them to the purposes provided in § 383.13, they were not collected under authority of that provision.

■ III. *Disposition of the surplus revenue.* The states acquired the bridge by agreement and not by condemnation or expropriation under the federal statute. The statute does not prescribe the terms of such an agreement, but simply leaves the terms of the arrangement for toll-free operation of the bridge to be worked out between the parties. There is nothing in the statute which requires surplus toll revenue to be transferred with the bridge. Thus, if the states have any right to the money the bridge commission had on hand at the time of conveyance it must be found in the agreement.

The 1965 agreement does not mention surplus toll revenue or any other personal property owned by the bridge commission. It does reflect an awareness tolls were being applied to operate and maintain the bridge. It authorizes continuance of such expenditure. It also requires not only that the bridge be toll free when conveyed but that it be structurally sound and in a good state of repair.

Continued operation and maintenance of the bridge during the period of debt elimination pursuant to the agreement would obviously require the keeping of regular accounts attendant to such operation and maintenance. Equipment and materials would have to be purchased, some work would probably have to be contracted for, and employees would have to be paid. The states were aware of this at the time the agreement was made. If they were realistic they knew the bridge commission would probably have funds on hand at the time the bridge was to be conveyed. They also knew the commission owned equipment and other personal property used to operate and maintain the bridge.

The State does not contend the bridge commission or City breached the 1965 agreement in any respect.

■ Trial court held the omission of any reference in the agreement to surplus revenue or personal property was intentional. We agree. The contract purports to be complete but contains no mention of surplus revenue or personal property. It is reasonable to infer the omission was intentional. See 3 Corbin on Contracts § 552 at 206 (1960).

■ This view is confirmed by the agreement of the parties expressed in the minutes of their February 1969 meeting. A practical construction of a contract by the parties is relevant to its legal construction. Porter v. Iowa Power and Light Company, 217 N.W.2d 221, 229–230 (Iowa 1974); 3 Corbin on Contracts § 558 (1960); 4 Williston on Contracts § 623 (Third ed.1961). Despite discussion that the December allocation to the sinking fund would create a surplus in that account, the parties agreed that only the bridge, real estate, and plans, specifications and maps were to be transferred. No complaint was made when nothing else was transferred. There is no evidence of any

claim to the surplus toll revenue by the states until after it was transferred to the City in December 1971.

Our conclusions can be briefly summarized. The State failed to establish its contention the surplus revenue was collected in contravention of the federal statute. We find the money was obtained under authority of the statute. The State also failed to show the statute required the revenue to be transferred to the states with the bridge. We find the statute does not impose such requirement but leaves the terms of voluntary transfer up to the parties. In this case we find the parties purposely excluded surplus revenue from the subject matter to be conveyed to the states.

Trial court properly entered judgment for the City.

Affirmed.